Filed 12/10/25  P. v. Perez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL PEREZ,<br><br>    Defendant and Appellant. | H051920<br>(San Benito County<br>Super. Ct. No. CR2100966) |

In 2023, a jury found Rafael Perez guilty of sexual penetration by a foreign object of victim Jane Doe[1], who was unconscious at the time of the offense (Pen. Code, § 289, subd. (d)(1))[2].  The trial court subsequently sentenced Perez to a term of three years in prison, but suspended execution of the sentence and placed Perez on formal probation for three years.  As a condition of his probation, the trial court required Perez to register as a sexual offender pursuant to section 290.

On appeal, Perez, through retained counsel, challenges the sufficiency of the evidence to support his conviction.  He also raises numerous claims of error, including challenging the constitutionality of his section 290 registration, alleges judicial and prosecutorial misconduct, and asserts he received ineffective assistance of counsel.

---

[1] Alleged victims of certain offenses, including sex offenses, may be referred to in all records and during all proceedings as John or Jane Doe if reasonably necessary to protect the privacy of the person.  (§ 293.5, subd. (a).)

[2] Undesignated statutory references are to the Penal Code.

For the reasons explained below, we find no merit to Perez's claims and affirm the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Procedural History*

On August 18, 2021, the San Benito County District Attorney filed a complaint charging Perez with sexual penetration by a foreign object of victim Jane Doe, who was unconscious at the time of the offense, with this fact being known to Perez (§ 289, subd. (d)(1); count 1).  Following a preliminary hearing on April 8, 2022, the complaint was subsequently "deemed [an] information."

On March 30, 2023, following a three-day jury trial, Perez was found guilty of the offense as charged.

On January 11, 2024, the trial court denied Perez's motion for a new trial.  The trial court sentenced Perez to the lower term of three years in prison, with execution of the sentence to be suspended, and placed Perez on formal probation for three years.  As a condition of Perez's probation, the trial court ordered Perez to register as a lifetime sexual offender pursuant to section 290.

Perez timely appealed.

### B.  *Factual Background*

#### 1.  *Prosecution's Case*

##### a.  *Testimony of Jane Doe*

###### i.  *Events Leading Up to the Assault*

On August 14, 2021, Jane Doe hosted her birthday party at her home in Hollister. In attendance were various family members, including her younger sister B.P.[3] and B.P.'s boyfriend, Perez.  Doe indicated that while she did not know Perez well, she had a

---

[3] We refer to the civilian witness in the proceeding by her initials to protect her personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10).

friendly relationship with him. At approximately 7:30 p.m., Doe began drinking tequila, and consumed approximately five shots of tequila between 7:30 p.m. and 11:30 p.m. B.P., Perez, and Doe's husband were also drinking during this time.

Doe noted that at approximately 9:30 p.m. or 10:00 p.m., B.P. seemed pretty drunk, and around 11:30 p.m., B.P. began throwing up in the backyard. Doe then helped B.P. inside to the restroom and subsequently took her upstairs to Doe's bedroom, where Perez joined them. With Perez's assistance, Doe helped B.P. change her clothes and laid her down on Doe's bed, where B.P. fell asleep. Perez suggested they go back downstairs to rejoin the party, and Doe and Perez left the room. Doe indicated that while she had a "buzz" at the time, she was not heavily intoxicated, was aware of her surroundings, and stopped drinking after this point. She also observed that Perez had a "pretty good buzz" but did not appear drunk. Doe continued to check on B.P. every 15 to 20 minutes, and B.P. eventually moved from Doe's bed to sleep on the floor. Doe ultimately came up to her room, changed into pajamas, and fell asleep on the bed around 1:30 a.m.

### ii.    *Assault and Immediate Aftermath*

The next morning, Doe woke up between 6:00 a.m. and 6:30 a.m.[4] when she felt a hand inside her vagina. Doe, who was lying on her back, then saw Perez on his knees next to her with his hand inside of her. While Doe did not see Perez's hand, she indicated it felt as though he had three fingers inside of her vagina. Doe further noted that at the time, she was still lying inside the comforter and the top sheet, which she had covered herself with when she went to sleep. Doe quickly sat up and observed Perez looking up at her "surprised" that she had woken up. Perez then crawled around to the other side of the bed and lay down on the floor next to B.P., who was still asleep. Doe subsequently realized she did not have her shorts or underwear on and ran to her closet to grab a new

---

[4] Doe noted on cross-examination that at the time she woke up, there was sufficient daylight coming into the room from the window for her to see what was going on in the room.

3

pair.  Doe also noted that when she woke up, her husband was asleep next to her on the bed.

After putting her clothes on, Doe began feeling pain and pressure in her vagina and thought she may be bleeding.  Doe came back into the bedroom, then went to another bathroom to check herself.  Doe noted that before she went to the other bathroom, she observed that B.P. still appeared to be asleep on the floor.  Once she finished checking herself, Doe then came back into the bedroom and lay down on the bed to wait for everyone to wake up.  Doe indicated that she felt "stupid" and "helpless," and thought: " 'How stupid am I going to look right now, to wake everybody up and say, "Hey this person's pretending to be asleep." '  What do I say?"  Doe also did not wake up her husband to tell him what had happened, as she was not sure how to put it into words and was afraid her husband might be embarrassed or ashamed that someone else had touched her.

B.P. and Doe's husband woke up approximately an hour later and began talking to each other.  B.P. then asked Doe why her underwear and shorts were on the floor, to which Doe answered "that's weird. I'm wearing – wearing shorts, look."  B.P. then grabbed Doe's underwear and shorts from the foot of the bed and showed them to her; until this point, Doe had not seen them there.  When Doe asked her husband who had changed her, Perez laughed, then got up and walked by the bed over to the window, saying "Man, my hand is hurting me today and I don't know why," while shaking his hand.  Doe did not respond but indicated that she felt "more dumb" after hearing Perez's statement.

During the next hour, Perez and B.P. left the room, while Doe and her husband got ready.  When Doe came out of her room into the kitchen, she observed that Perez and B.P. had already eaten breakfast.  B.P. then asked Perez why they were leaving, as B.P.'s

4

and Doe's parents were coming over, but Perez got up and walked out, and B.P. followed him.

### iii. Report to Police and Subsequent Events

After B.P. and Perez left, Doe did not tell anyone what happened to her that day, as she was still trying to process what occurred and was unsure of whether she was even going to say anything. However, when she woke up the following morning (August 16), she decided she needed to say something and texted B.P. to arrange to meet her later that day. When Doe and B.P met in person that afternoon, Doe told B.P. that Perez had touched her inappropriately. According to Doe, B.P. was very mad and upset, indicated that what Perez had done was "not okay", and told Doe to make a police report. B.P. and Doe then went to Doe's house, where B.P. told Doe's husband what happened. Doe's husband subsequently called the police. Doe's husband also removed the sheets from their bed and put them in the laundry.

After Doe provided details of the incident to the responding officer, Officer Jason Leist, he offered her the option of undergoing a sexual assault exam. Doe chose not to have the exam at that time, as she was scared and felt that if she did the exam, it would "feel like – 'Okay, this is more -- this is real. I did get abused.' " However, on the next day, August 17 Doe decided to do the exam after speaking to an advocate from the district attorney's office, and had the exam performed that evening. Doe further indicated that she had consensual sex with her husband on the morning of August 14 but noted that this did not involve any digital penetration. She also stated that she generally did not experience vaginal pain after consensual sex, particularly in the same manner as she did after the incident.

After reporting the incident to the police, Doe informed the rest of her family, including her parents, sisters, and brother, about what Perez had done. Doe indicated that her family initially supported her in pursuing a case; however, two days after she informed them, Perez bailed out of jail, and B.P. decided to remain in a relationship with

5

Perez. At that point, Doe testified that her family "played the whole thing" and pretended as though nothing happened. As a result, Doe no longer had a relationship with any of her family members at the time of trial. Doe also stated that she and her husband subsequently moved from Hollister to Southern California because she no longer felt safe, particularly since Perez still lived in the area and frequently visited her parents, whose home was three blocks away from Doe's former home.

### b. Sexual Assault Examination

Forensic Examiner and Nurse Danielle Smith, who conducted Doe's sexual assault examination, testified that in her experience, a sexual assault examination is typically performed up to 10 days after the incident in question occurs. Smith indicated that she first performed a medical exam, where she conducted a head-to-toe examination and checked for sexually transmitted diseases and pregnancy, and subsequently performed a forensic physical exam to document any injuries and collect swabs for potential DNA evidence. In Doe's case, Smith took swabs from Doe's neck, breasts, and pubic area, as well as her external and internal genital areas. Smith also used an instrument known as a colposcope—a small microscope specifically designed for looking at the genital area. The colposcope has a camera attached to the end, which Smith used to take pictures of any injuries she observed.

Smith indicated that during her examination of Doe, she observed redness and abrasions to Doe's external genitalia, including her labia majora, labia minora, hymen and around her urethra. Smith defined an abrasion as an injury that occurs when "pressure, along with friction, is applied to the skin and the top layer of skin is rubbed away." Smith also observed several rounded, crescent-shaped lacerations in Doe's perihymenal area (the area just external to the hymen). Smith indicated that the lacerations were consistent with Doe's report of being digitally penetrated, as fingernails can sometimes leave crescent-shaped marks.

6

Smith took pictures of Doe's injuries using the camera attached to the colposcope but later found that some of the pictures did not fully depict the injuries she had observed during the physical examination, particularly the lacerations. Smith indicated that this could be due to a number of factors, including lighting from the colposcope, the patient's anatomy, slight movements in the camera when the picture is taken, and movement of tissue, which often may need to be done to visualize very small lacerations. Smith further noted that evidence of trauma was not always present in many sexual assault cases, but this was not indicative of whether the assault had occurred; similarly, injury could result from consensual sexual encounters. However, in Doe's case, Smith concluded that Doe's injuries were consistent with Doe's report of being digitally penetrated.

On cross-examination, Smith confirmed that Doe told her she had consensual sex with her husband on the morning of August 14 and acknowledged that a number of Doe's injuries were consistent with consensual intercourse. However, Smith indicated that the lacerations she observed were more consistent with digital penetration than penetration by a penis, because the crescent shape of the lacerations matched the crescent shape of fingernails.

### 2. Defense Case

#### a. B.P.'s Testimony

B.P. confirmed that she and Perez had attended Doe's birthday party, and that everything seemed "fine" immediately afterwards from what she observed. B.P. also indicated that at that time, Doe and Perez "got along" and had a good relationship. As a result, when Doe first told B.P. about the incident with Perez, B.P. was shocked and "couldn't believe it" because everything had seemed fine and Perez had never made her feel uncomfortable in the past. B.P. further indicated that when Doe told her the incident took place at 6:00 a.m. on the morning of August 15, B.P. questioned Doe about this timing because she (B.P.) was awake at that time checking her phone and putting it on

7

charge, and she had observed Perez lying on the floor next to her. B.P. further noted that she did not go back to sleep after checking her phone, and confirmed that after everyone began waking up, she saw Doe's underwear on the floor by the foot of the bed. B.P. also indicated that she did not see Doe naked at any point in time.

On cross-examination, B.P. acknowledged that she had consumed a number of drinks and shots and could not recall how many shots she had. B.P. further indicated that she recalled Doe taking her to the bedroom, changing her clothes, and trying to get her to sleep on the bed, but B.P. ultimately ended up sleeping on the floor on the right side of the bed. B.P. confirmed that Perez did not stay in the room with her and was not there when she fell asleep, but he was sleeping next to her when she woke up the following morning; she also observed Doe and Doe's husband still asleep in their bed. B.P. additionally indicated that when Doe told her about the incident, she confronted Perez and told him to move out and later found out he had been arrested. However, once he was released, B.P. did not end her relationship with him. B.P. further confirmed that she was present during Doe's interview with the police and spoke with them, but she did not mention to the police that she had been awake at 6:00 a.m. on the morning of the incident. B.P. later testified that at some point in time after the incident, she and Perez moved to another state and had a child together, and he was financially responsible for their expenses.

### b. Defense Expert Testimony

Dr. Joyce Adams testified on behalf of the defense as an expert in forensic sexual medical examinations. Dr. Adams indicated that based on her review of Smith's report on Doe's physical examination and the photographs taken, some of Doe's documented injuries were clearly visible, while others were not. In particular, Dr. Adams only observed abrasions but did not observe any of the crescent-shaped lacerations. She further indicated that the forensic examination itself would not allow someone to distinguish between injuries from consensual versus nonconsensual intercourse.

8

On cross-examination, Adams did not find fault with the methodology used by Smith in her report or exam and confirmed that crescent-shaped lacerations could be consistent with fingernails. Adams also acknowledged that it was possible for lighting to affect the quality of photographs taken by the camera attached to the colposcope. Adams further agreed that trauma was not always observed in patients reporting sexual assault, and a lack of findings would not rule out the possibility that an assault occurred. She additionally acknowledged that the farther out the exam was done from the time of trauma, the greater the possibility that any injuries may have healed.

### c. *Perez's Testimony*

Perez, who testified in his own defense, indicated that he had moved in with B.P. to her parents' house in August 2021 at some point before Doe's birthday party. Perez and B.P. subsequently moved to Oregon in January 2022 when he took on a new position, then later moved to Washington State, where they were residing at the time of trial.

Perez stated that on the day of Doe's party, he and B.P. initially dropped off a bottle of alcohol earlier in the afternoon, then returned for the party at approximately 6:30 p.m. to 7:30 p.m. During the course of the party, Perez consumed approximately 10 to 13 shots and three beers, with his last beer at approximately 1:00 a.m. Perez additionally confirmed that he and Doe took care of B.P. while she was throwing up and helped get her settled into Doe's bedroom; Perez then left the room and returned to the party until approximately 2:00 a.m.

Perez testified that when he returned to the room at 2:00 a.m., he fell asleep on the floor next to B.P. and did not wake up until approximately 8:00 a.m. or 9:00 a.m. Perez denied touching Doe inappropriately and denied ever getting onto her bed from the floor and removing the covers.

9

On cross-examination, Perez indicated that he was still "involved" and "participating" in the party after consuming his shots and beers and was not "completely blacked out"; however, he acknowledged he had also thrown up when B.P. first began throwing up in the backyard. Perez also testified that prior to the incident, he had a good relationship with Doe and her husband and had been to their home multiple times.

## II. DISCUSSION

### A. *Request for Judicial Notice*

Prior to reaching the merits of the appeal, we first address Perez's request for judicial notice (RJN)[5] for various items that he claims are relevant to the determination of the issue raised on appeal.

#### 1. *Applicable Law and Standard of Review*

A request for judicial notice in the court must be served and filed in a separate motion with a proposed order. (Cal. Rules of Court, rule 8.252(a)(1).) The motion must explain the relevance of the matter to the appeal; whether the matter to be noticed was presented to the trial court and whether judicial notice was taken; if the trial court did not judicially notice the matter, why the matter is subject to judicial notice under Evidence Code section 451, 452 or 453; and whether the matter concerns proceedings after the order or judgment that is the subject of the appeal. (Rule 8.252(a)(2).)

"Reviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) Judicial notice should be taken only of relevant matters. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1; *Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 569.) "While we may take judicial notice of the existence of judicial opinions, court documents, and verdicts reached, we cannot take judicial notice of the

---

[5] By separate order, we deferred ruling on Perez's RJN for consideration with the merits of the appeal.

10

truth of hearsay statements in other decisions or court files [citation], or of the truth of factual findings made in another action." (*Johnson & Johnson v. Superior Court* (2011) 192 Cal.App.4th 757, 768.)

"While courts may notice official acts and public records, 'we do not take judicial notice of the truth of all matters stated therein.' [Citations.] '[T]he taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom.' [Citation.]" (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063–1064, disapproved on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1273.)

2.  ***The Facts and Propositions Cited in Perez's RJN Were Not Presented to the Trial Court and Are Irrelevant to Determination of the Issues Raised on Appeal***

In his RJN, Perez requests that this court take judicial notice of the following facts and/or propositions: (1) "human beings are not automatically rational; (2) the idiom "butt naked" means "completely naked"; (3) sunrise in San Jose, California on August 15, 2021, took place at 6:24 a.m.; (4) the term "fisting" is the act of asserting a hand into a person's vagina or anus, and such an act medically requires abundant amounts of lubricant; (5) cell phones have a visible digital clock on their face even while other ordinary applications are being used, such as texting or e-mailing; (6) vaginal tears, known as simple cuts or microtears, usually heal within two days; (7) the word "outcast" means "rejected or cast out"; and (8) the "recency effect" on juries exists according to legal scholarship. Perez argues that these facts are relevant to the issues on appeal, including but not limited to the sufficiency of the evidence to support Perez's conviction, the credibility of Doe's testimony, and the claims of implicit judicial bias and

11

prosecutorial misconduct. While Perez acknowledges that these facts were not judicially noticed in the trial court, he claims that seeking judicial notice would have been futile due to prosecutorial misconduct and judicial bias in the trial court proceedings. He further asserts that judicial notice is appropriate as the "[f]acts and propositions … are of such common knowledge within the territorial jurisdiction of the court that they cannot be the subject of dispute," (Evid. Code, § 452, subd. (g)) and that items 2 and 7 must be judicially noticed because they refer to "[t]he true signification of all English words and phrases and of all legal expressions" (Evid. Code, § 451).

The Attorney General objects to the RJN in full, arguing that these facts were not judicially noticed by the trial court and are irrelevant to the issue on appeal, particularly since many of them seek to introduce new evidence not on the record, and are not widely accepted or easily verified. We agree.

"Although Evidence Code section 459, subdivision (a) generally requires that a reviewing court must take judicial notice of matters the trial court judicially noticed, there are … exceptions: (1) if the matter was not 'properly noticed by the trial court,' the appellate court is not required to take judicial notice …' (Evid. Code, § 459, subd. (a).)" (*Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 360; see also *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325–326 ["An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance"]; *People v. Jacinto* (2010) 49 Cal.4th 263, 272, fn. 5 [" '[A]n appellate court generally is not the forum in which to develop an additional factual record.' "].) As Perez concedes, none of the facts and propositions above were presented to the trial court. Further, while Perez claims such a request would have been "futile" in the trial court due to judicial bias and prosecutorial misconduct, he cites no legal authority, nor are we aware of any, demonstrating that this somehow permits appellant to request judicial notice of facts not presented to or properly noticed by the trial court. And as we will explain, Perez cites no

12

facts from which we might infer bias or misconduct. We therefore find no basis to grant judicial notice of such matters that should have been presented to the trial court and therefore deny Perez's request.

**B.     *Sufficiency of Evidence***

Perez contends that "no reasonable jury" would have reached a verdict of guilt in the matter because there was no evidence presented to demonstrate that Perez was aroused or sexually gratified by the alleged contact, or that he intended to hurt or cause discomfort to Doe. Perez cites "24 exaggerations and embellishments" made by Doe and the prosecution that formed the "unreasonable bases" for the guilty verdict. Relying on the standard jury instruction that one must accept those inferences that point to innocence when two or more reasonable conclusions can be drawn from circumstantial evidence, Perez argues that these "vignettes" of "exaggerated or embellished" circumstantial evidence also pointed to innocence and therefore required the jury to find Perez not guilty.

### 1.  *Applicable Law and Standard of Review*

"In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question . . . is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) The California Constitution requires the same standard. (*Ibid.*) "[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] A reviewing court must reverse a conviction where the record provides no discernible support for the verdict even when viewed in the light most favorable to the judgment below. [Citation.] Nonetheless, it is

13

the [trier of fact], not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt. [Citation.]" (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793 (*Stanley*).)

A conviction for sexual penetration of an unconscious person under section 289, subdivision (d), requires proof of the following four elements: "1. The defendant committed an act of sexual penetration with another person [¶] 2. The penetration was accomplished by using a foreign object [¶] 3. The other person was unable to resist because she was unconscious of the nature of the act; [¶] AND 4. The defendant knew that the other person was unable to resist because she was unconscious of the nature of the act. [¶] Sexual penetration means penetration, however slight, of the genital opening of the other person for the purpose of sexual abuse, arousal, or gratification. [¶] A foreign object, substance, instrument, or device includes any part of the body except a sexual organ. [¶] Penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort." (*People v. Dillon* (2009) 174 Cal.App.4th 1367, 1377, quoting CALCRIM No. 1045.)

14

## 2. *Analysis*

As a preliminary note, in Perez's entire argument regarding the sufficiency of the evidence, Perez does not cite any legal authority to support his contentions. Instead, he simply takes issue with several portions of Doe's testimony and challenges the credibility of her statements. For example, Perez contends that: (1) the alleged assault, which occurred without any lubrication, would have required "an almost miraculous feat of pain-endurance"; (2) Doe's description of her estrangement from her family could not be linked to Perez's alleged assault; and (3) the details Doe provided about the timing and circumstances of the assault were contradictory, unlikely, and "likely impossibl[e]." However, as the Attorney General correctly notes, a reviewing court may not redetermine the credibility of witnesses or reweigh any of the evidence. (See *People v. Elliot* (2012) 53 Cal.4th 535, 585 (*Elliot*) [noting that " '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' "], citations omitted.) Accordingly, our review of the sufficiency of the evidence does not turn on the credibility of Doe's statements, or alleged lack thereof as asserted by Perez.

Turning to the record and viewing the evidence presented in the light most favorable to the judgment, we find substantial evidence to support Perez's conviction. Doe testified clearly that she was awakened early in the morning on August 15th by the feeling of Perez's fingers inside her vagina and later felt pain and discomfort in her vagina that she did not usually feel after consensual sex. Doe also testified that she fell asleep with her shorts and underwear on, and woke up to discover them no longer on, which was corroborated by B.P.'s testimony that she later found Doe's clothing at the foot of the bed. Doe further indicated in her testimony that Perez appeared surprised when she woke up. In addition, Smith testified that the crescent-shaped lacerations she observed during Doe's physical examination were consistent with digital penetration by

15

fingernails, which Doe stated only happened with Perez, and not with her husband during their consensual sexual encounter on the morning of August 14.

Further, "[u]nless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*Elliott, supra,* 53 Cal.4th at p. 585.) We find nothing in Doe's testimony to demonstrate that the facts or events she described were physically impossible or inherently improbable such that it would be insufficient to support the conviction. Additionally, as noted above, while Doe's testimony conflicted with other testimony, including: (1) Perez's denial of the assault; (2) B.P.'s testimony that she did not see anything happening when she woke up at 6:00 a.m.; and (3) Dr. Adams' inability to see the lacerations in the photographs, it was ultimately the jury's responsibility to resolve conflicts in the evidence and assess who they found more credible. Accordingly, insofar as Perez's claim rests on his assertion that Doe's testimony was not credible and contradicted by other evidence, such a claim does not withstand substantial evidence review.[6]

In summary, we find that based on Doe's testimony, there was substantial evidence for the jury to reasonably conclude that: (1) Perez committed an act of sexual penetration, and the penetration was sexual in nature as it resulted in pain and discomfort to Doe, thus constituting sexual abuse; (2) the penetration was accomplished with a foreign object, namely, Perez's fingers; (3) Doe was unable to resist because she was asleep and therefore unconscious of the nature of the act; and (4) based on Perez's surprise when Doe woke up, the jury could have reasonably inferred that he knew she was asleep and unable to consent as a result. Accordingly, we conclude that substantial

---

[6] Indeed, given B.P.'s and Perez's relationship at the time of the assault, and their ongoing relationship during the time of trial, it would have been reasonable for the jury to entertain doubts as to the credibility of their testimony.

16

evidence supported Perez's conviction for sexual penetration of an unconscious person under section 289, subdivision (d).

## C.     *Constitutionality of Lifetime Sexual Offender Registration*

Perez next argues that if this court concludes that substantial evidence supports his conviction, the condition of his sentence requiring him to register as a sexual offender for life should be reversed. Perez claims that the registration requirement is "patently unjust and unconstitutional," constitutes cruel and unusual punishment, and "incentivizes perverse motives to make false accusations." Perez further argues that the lifetime registration requirement "often" requires a showing of force, which was not present in the instant case. In response, the Attorney General argues that Perez has forfeited this claim by failing to object to the registration requirement at trial, and even assuming no forfeiture, Perez's constitutional challenges are without merit.

The Sex Offender Registration Act was enacted "to prevent recidivism of sex offenders and facilitate their surveillance by police" by requiring registration of sex offenders. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 874.) The Act currently has three tiers of registration. (§ 290, subd. (d).) Tier one offenders must register for a minimum of 10 years (§ 290, subd. (d)(1)(A)), and tier two offenders for a minimum of twenty years (§ 290, subd. (d)(2)(A)). After these periods expire, tier one or two offenders may petition for termination of registration. (§ 290.5, subd. (a)(1).) Tier three offenders, by contrast, must register for life with no possibility of termination. (§ 290, subd. (d)(3)(A)). The Sex Offender Registration Act treats individuals such as Perez who are convicted under section 289, subdivision (d) as tier three offenders. (§ 290, subd. (d)(3)(Q).)

While the Attorney General is correct that Perez did not object to the constitutionality of the registration requirement at sentencing, we nevertheless shall reach the merits of Perez's claim inasmuch as the finding of forfeiture would invite further litigation of trial counsel's competence, which Perez has already challenged on appeal.

(See *People v. Em* (2009) 171 Cal.App.4th 964, 971–972, fn. 5; see also *People v. Norman* (2003) 109 Cal.App.4th 221, 229 [declining to find forfeiture when doing so would raise a cognizable claim of inefficient assistance of counsel].)

With that said, we find no merit to Perez's constitutional challenges. It is well established that sex offender registration, in and of itself, "serves an important and proper remedial purpose" and is not "so punitive in fact that it must be regarded as punishment." (*People v. Castellanos* (1999) 21 Cal.4th 785, 796 [sex offender registration was not punishment for purposes of ex post facto analysis]; *In re Alva* (2004) 33 Cal.4th 254 [life-long sex offender registration not punishment for purposes of prohibition against cruel and unusual punishment].) Perez neither acknowledges this established precedent, nor does he make any cognizable legal argument as to why such law should not apply to his registration requirement. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Stanley*, *supra*, 10 Cal.4th at p. 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may … pass it without consideration.' "]; *People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8 ["We need not consider such a perfunctory assertion unaccompanied by supporting argument"] (*Smith*).) Accordingly, we find no basis to reverse the lifetime registration requirement of Perez's sentence.

## D.    *Evidentiary Errors*

In a section of his brief titled "Matters Preserved For Appeal Or In No Need of Preservation For Appeal," Perez identifies 17 issues where he contends the trial court erred during trial. For the first 16 issues, Perez points to a portion of the record – most of which are evidentiary objections, asserts that the trial court's ruling in each such instance was erroneous, and claims that such error was prejudicial. He further claims that as to all the issues raised, "due to the argument in the heading the court committed reversible structural error that does not need to be preserved to be reviewed yet it was preserved by several of defense's objections and arguments, it was not harmless error, and as such

18

judgement in favor of Appellant reversing each conviction should be granted." However, as the Attorney General correctly points out, at no point in his description of each issue does Perez cite any case law, present a cognizable legal argument, or attempt to explain how his contention fits into a relevant legal framework for finding prejudicial error. The final issue is separated into four subheadings, which appear to apply to the entirety of the trial proceedings. For the reasons discussed below, we find that Perez has forfeited these issues by failing to present sufficient argument to preserve them on appeal, and even if we did not find forfeiture, our review of the issues raised reveals no error warranting reversal.

### 1. *Applicable Law and Standard of Review*

Perez's arguments raise various claims that encompass evidentiary and procedural issues, including rulings on objections and the wording of certain jury instructions. In general, rulings by the trial court on the admissibility of evidence are reviewed for abuse of discretion. (See *People v. Waidla* (2000) 22 Cal.4th 690, 717.) Conversely, the question of whether a jury instruction is a proper statement of the law is generally a mixed question of law and fact that we review de novo. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Subject to certain exceptions, to preserve issues for appeal, an objection must be made to the trial court. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–434 [timely objection on specific grounds required to preserve objection to erroneous admission of evidence].) Similarly, certain jury instruction objections can be forfeited if no objection was raised to the trial court. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 750 [" 'A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial' "].) Finally, as cited previously, the failure to properly raise a disputed issue on appeal through the citation of authorities and presentation of proper legal argument can result in forfeiture of that contention. (See *People v. Freeman* (1994) 8 Cal.4th 450, 482,

fn. 2. ["To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis"].)

### 2. *Perez Has Forfeited Any Allegations of Error*

The People argue that Perez has forfeited his allegations of error because none of the claims raised contain "reasoned analysis of any purported trial errors, and, in particular, none attempts to show prejudice from any purported error." We agree that Perez's failure to present meaningful legal argument or cite any authority in support warrants forfeiture.

For example, the first matter cited by Perez is defense counsel's objection to Doe's testimony that Perez was pretending to be asleep after he moved off the bed to the floor next to B.P. However, Perez specifically notes that counsel's objection was sustained, and the testimony was stricken. Accordingly, it is unclear what, specifically, Perez claims to have been in error from this statement. Apart from a subsequent argument that Doe's testimony constituted "double hearsay" in her "mind's thoughts," and was therefore speculative and nonresponsive[7], Perez fails to provide any argument as to why the ruling on counsel's objection—which was in his favor—constituted error. We further note that this is reflective of two other issues raised by Perez, where the trial court sustained objections made by the defense, and Perez does not provide any explanation or clarification of why such a ruling constituted error.

As another example, the sixth issue cited by Perez is that defense counsel's objection to certain redirect questions as beyond the scope of cross examination was incorrectly overruled. However, apart from noting where this objection appeared in the record, he fails to provide any argument as to why the ruling was incorrect, including any

---

[7] Notably, defense counsel did not object to Doe's testimony on any of these bases.

citation to relevant legal authority regarding the scope of redirect examination. Similarly, in the thirteenth identified issue, Perez argues that the trial court erroneously replaced the word "charges" with "crimes," in a jury instruction, which appears to be a reference to one of the verdict forms for the lesser included offense of simple battery. (§ 242.) Perez claim that this change was reversible error, because it caused the jury to "believe that the lesser crimes were already proven and the only question they needed to decide was the greater charge" but yet again provides no citation to authority or relevant legal argument to support such a claim. We therefore find that Perez's repeated failure to develop any argument or cite authority in support of the claimed errors constitutes forfeiture.

Further, even if we were to reach the merits of the issues raised, our review reveals that none of them demonstrate prejudicial error. As noted above, a number of the objections identified by Perez as "preserved" were objections made by defense counsel that were sustained by the trial court, and we fail to recognize how rulings made in Perez's favor constitute reversible error. With respect to the alleged error in the jury instruction noted above, the record reflects no objection that was raised by the defense to this instruction in the trial court, thus forfeiting it for appeal. (See *People v. Delgado* (2017) 2 Cal.5th 544, 575 ["Because this argument merely goes to the clarity of the instruction, it is forfeited by defendant's failure to object below."].) Regardless, the record reflects no error, as there is no challenge that the instruction reflected an incorrect statement on the law by substituting the word "crimes" for "charges."

Finally, we turn to Perez's seventeenth and final assertion, which contains multiple subheadings. The first three subheadings pertain to Perez's claim that his right to confrontation, a fair trial, and a proper adversarial process were all violated due to the lack of proper photographic evidence to support Smith's observations of Doe's injuries, as well as the prosecution's "deficient" manner of presenting the case and failure to call "logical" witnesses or properly investigate the charges brought. However, as with the issues raised above, these issues once again contain no cognizable legal argument, and no

21

citation to relevant legal authority, apart from a general citation to a defendant's constitutional rights under the Sixth and Fourteenth Amendment. We therefore consider them forfeited.

The fourth subheading is entitled "*The Prosecution Caused Hobbesian Perversions of the People of California's Sovereignty*," and contains more broad assertions than the other claims raised. The argument begins by claiming "that prosecutorial discretion allows for the prosecutor to exclude certain witnesses to shape the case. But this case pushes the boundary too far" The argument then makes references to a 1793 United States Supreme Court case, *Chisholm v. Georgia* (1793) 2 U.S. 419 (*Chisholm*); Thomas Hobbes' *Leviathan* (1651); French monarch Louis XIV; and a recent case concerning presidential authority (*Trump v. United States* (2024) 603 U.S. 593 (*Trump*)), and concludes that "[b]y allowing the prosecution to bolster expert and detective witnesses with video and photographic failures and errors is a style of Hobbesian prophecy." Perez then asks this court to "distinguish the California body politic from the erroneous depiction of the people confused with state and executive found on the frontispiece of Thomas Hobbes' *Leviathan* by reaffirming the prosecution's duties to follow evidence even if it exonerates a suspect."

It is not particularly clear how this argument advances Perez's position on appeal. Like many of Perez's other claims, Perez does not include any cognizable legal argument or citations to relevant legal authority. Specifically, the two United States Supreme Court cases cited (*Chisholm*, *supra,* 2 U.S. 419 and *Trump*, *supra,* 603 U.S. 593) have no bearing on any of the prosecution's conduct in the instant matter. Accordingly, Perez fails to affirmatively demonstrate error or any prosecutorial misconduct warranting reversal.

## E.     *Prosecutorial Misconduct*

Perez next argues that the prosecutor committed several acts of misconduct to ensure the jury delivered a guilty verdict, including "the exploitation of [Doe's] lack of

memory to vouch for facts not supported by the evidence." Perez cites 15 instances of misconduct, which can be grouped into three categories: (1) impermissible vouching for facts during opening statements that were not subsequently introduced into evidence; (2) asking questions on direct examination that were designed to "inflame the passions of the jury"; and (3) impermissible vouching for facts not in evidence during closing arguments and rebuttal.

We note that while Perez provides a general discussion containing many principles related to prosecutorial misconduct claims, he does not cite any case law or statute in connection with each individual allegation of misconduct. Instead, Perez makes the general contention that "these instances of misconduct separately and cumulatively deprived Appellant of his right to a fair trial" and certain claims about improper prosecutorial conduct resulting in prejudicial "structural error."

### 1. *Applicable Law and Standard of Review*

" ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*), internal quotation marks & citations omitted.) In addition, it must have been reasonably probable that " 'without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.]' " (*People v. Dykes* (2009) 46 Cal.4th 731, 760 (*Dykes*).)

"We review the trial court's rulings on prosecutorial misconduct for abuse of discretion." (*People v. Peoples* (2016) 62 Cal.4th 718, 792–793 (*Peoples*).) Accordingly, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the

23

impropriety." ' "(*Dykes, supra*, 46 Cal.4th at p. 760.) Where no objection is made, " 'the point is reviewable only if an admonition would not have cured the harm caused by the misconduct' " or an objection would be futile. (*People v. Clark* (2016) 63 Cal.4th 522, 577 (*Clark*).)

## 2. *Perez's Claims of Prosecutorial Misconduct Are Both Forfeited and Without Merit*

Although Perez claims that objections were made "generally" to the alleged prosecutorial misconduct, he fails to provide any indication, nor does the record affirmatively demonstrate, that any objections were made to the 15 instances of alleged misconduct cited in Perez's opening brief. He further contends that specific objections on the basis of being nonresponsive, calling for speculation, or narrative would have been futile because "the damages is already done once [Doe] exaggerated the facts." However, such an argument fails to explain why a curative instruction would have been futile if any error had been found to exist. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853 [noting claim of futility must find support in the record].) Therefore, Perez has forfeited his claims through his failure to object at the trial level. (*Clark, supra,* 63 Cal.4th at p. 577.)

Notwithstanding the forfeiture, all of Perez's claims of misconduct are without merit. With respect to the first category of impermissible vouching during opening statements, Perez claims that the prosecutor stated she would proffer evidence that: (1) Doe's family had abandoned her because of the case: and (2) the covers were taken off from Doe, but no evidence was presented to confirm either of these statements. But Perez's arguments are not supported by the record. First, we find no mention of the covers at all in the prosecutor's opening statement, including any discussion about evidence that the covers had been taken off from Doe. To the contrary, it was defense counsel who mentioned the covers more than once during his opening statement; in fact, the record citation provided by Perez in his brief in support of his claim is to defense's

24

opening remarks, not the prosecution's. Second, the prosecution's statements about Doe's lack of relationship with her family because of the case do not rise to the level of impermissible vouching. "Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." ' " (*Linton, supra,* 56 Cal.4th at p. 1207.) We find nothing in the prosecution's remarks that reflect a reliance on anything other than the evidence that would be presented—and in fact, was presented through Doe's testimony— to the jury during trial.

Turning to the second category of improper questioning, Perez simply claims that the prosecutor "inappropriately sought to inflame the passions of the jury by asking several questions about how [Doe] felt about her family" with no reference to any specific questions or further argument as to how these questions would have inflamed the jury. As we have noted previously in this opinion, "[w]e need not consider such a perfunctory assertion unaccompanied by supporting argument." (*Smith, supra,* 30 Cal.4th at p. 616, fn. 8.)

With regards to the third category of impermissible vouching during closing argument and rebuttal, Perez claims that the prosecution referred to facts not in evidence or mischaracterized the evidence in a manner that was prejudicial and undermining of the defense case. This again finds no support in the record. Our review of the closing argument and the points cited by Perez reflect that the prosecution was simply addressing evidence that was presented to the jury during the trial to argue that Perez should be found guilty, which is permissible during closing argument. (See *People v. Lucas* (1995) 12 Cal.4th 415, 473–474 [prosecutors "have wide latitude to discuss and draw inferences from the evidence at trial"].) For example, Perez claims the prosecutor improperly vouched that B.P.'s testimony of being awake at 6:00 a.m. and not seeing anything taking

25

place was impeached or undermined by her failure to inform the investigating officer of the same facts. However, such a statement was a reasonable inference for the prosecution to draw from B.P.'s testimony confirming that she did not tell the officer that she was awake at 6:00 a.m. Similarly, Perez claims that the prosecutor "falsely vouched" that there was no evidence to show that Doe had a reason to lie or fabricate the assault, when there was "excluded" evidence that reflected otherwise. Yet such an argument, again, was a reasonable inference to be drawn from the evidence presented, particularly since B.P., Doe, and Perez all testified that Doe and Perez were on friendly and cordial terms prior to the offense.

Finally, even if we were to consider the possibility that misconduct occurred, Perez has failed to demonstrate how: (1) such conduct could be considered deceptive or reprehensible or that it so infected the trial with unfairness as to make the resulting conviction a denial of due process; and (2) it is reasonably probable that absent such errors, the outcome of the trial would have been different. We therefore find no merit to Perez's claims of prosecutorial misconduct.

## F. *Judicial Bias*

Perez next argues that the trial court judge's actions reflected bias against him, thus depriving him of his constitutional right to a fair trial. As with his claim of prosecutorial misconduct, Perez first outlines the general standard of review for judicial bias claims, then makes the following claims of bias: (1) "[E]veryone involved in this trial succumbed to implicit biases against Hispanic males that run deep in California, including Judge Hayes"; (2) "everyone involved in the trial succumbed to an over-sensitivity for the veracity of crime reports of sex crime victims—especially children— that clearly contradicted the testimony of the alleged victim on the stand"; (3) "implicit biases against Hispanic males, and for the veracity of sex abuse reports overawed the weight of all other evidence presented at trial including [Doe's] testimony on the stand"; and (4) while "not arguing that Hon. Hayes intended to express bias during

26

this trial," "but for Hon. Hayes' implicit biases, many of the structural errors present at trial might have been resolved during trial. Here, due to implicit biases the court allowed the prosecutor to exploit its bias to vouch repeatedly and inaccurately about the evidence produced before the jury as if it was not influenced extreme biases and interests in the outcome of this case when it was."

### 1. *Applicable Law and Standard of Review*

Arguments for reversal based on judicial bias generally are grounded in the due process clause, "which sets an exceptionally stringent standard." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589 (*Schmidt*).) "It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation. [Citation.] The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial." (*Ibid.*) Even numerous and continuous rulings against a party are not enough to meet this standard. (*Ibid.*) Further, "[a] defendant may not go to trial before a judge, betting on a favorable result and failing to raise objections of bias, and then argue on appeal that the judge was biased." (*People v. Johnson* (2018) 6 Cal.5th 541, 592 (*Johnson*).)

"Potential bias and prejudice must clearly be established by an objective standard." (*People v. Chatman* (2006) 38 Cal.4th 344, 363.) " ' "[W]e of course presume the honesty and integrity of those serving as judges." ' " (*Id.* at p. 364.) We review claims of judicial bias de novo. (*Schmidt, supra*, 44 Cal.App.5th at p. 589.)

### 2. *Perez Fails to Demonstrate Judicial Bias*

Perez cites three instances of rulings by the trial court that reflected judicial bias as follows: (1) the trial court "inappropriately interrupted" a line of questioning about Doe's credibility, from which the defense "never recovered"; (2) the trial court asserted its own basis for an objection as speculative instead of confining its ruling to the actual hearsay

objection made by the prosecution; and (3) the trial court improperly sustained a number of the prosecution's objections, which resulted in the exclusion of "constitutionally protected testimony." Perez claims that because these actions resulted in structural and harmful error, and objecting would have been futile, he was therefore precluded from his right to a fair trial.

We agree with the Attorney General that Perez's failure to raise any objections on the basis of judicial bias in the trial court results in forfeiture of his claim. (See *Johnson, supra,* 6 Cal.5th at p. 592.) On this basis alone, we need not reach the merits of Perez's claim. Nonetheless, even if we were to reach the merits, we find no support for a constitutional due process violation based on judicial bias. Like most of Perez's opening brief, Perez's claims are not supported by any relevant legal argument or citation to authority. Further, the three alleged instances of misconduct solely consist of adverse rulings against Perez, which, as noted above, are insufficient to demonstrate bias. (See *Schmidt, supra,* 44 Cal.App.5th at p. 589.) We therefore find the allegations of judicial bias to be unfounded.

## G. *Ineffective Assistance of Counsel*

Perez finally claims that he received ineffective assistance based on counsel's failure to raise proper objections on 11 separate occasions during the prosecution's case in chief. Perez claims that in six of these instances, counsel failed to object to various pieces of witness testimony on hearsay, relevance, or speculation grounds. Perez further argues that in the other five instances, counsel should have renewed a prior objection or erroneously struck testimony that was beneficial to the defense. It bears repeating that Perez's contentions here again consist of general discussion regarding the standard for establishing ineffective assistance of counsel, but no case law or other relevant legal citations in connection to each individual allegation of deficient performance, and no discussion of how the alleged deficient performance resulted in prejudice.

28

The standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687–694 (*Strickland*). This standard provides that: "[t]o secure reversal . . . upon the ground of ineffective assistance of counsel under either the state or federal Constitution, [an appellant] must establish (1) that … counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that [appellant] would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

It is the appellant's burden to demonstrate by a preponderance of the evidence that his or her counsel's performance fell below an objective standard of reasonableness. (See *In re Thomas* (2006) 37 Cal.4th 1249, 1257.) "Unless [an appellant] establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) Further, "[f]ailure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

In the instant matter, we find that Perez has failed to meet his burden to establish that counsel's failure to object on the occasions cited fell below an objective standard of reasonableness. Because deciding whether to object to evidence or argument is highly tactical, and tactical decisions are entitled to substantial deference, the failure to object

29

rarely establishes counsel's incompetence. (*People v. Centeno* (2014) 60 Cal.4th 659, 675; *People v. Majors* (1998) 18 Cal.4th 385, 403.) Beyond itemizing various instances where counsel did not object, Perez does not provide any argument as to how these omissions were unreasonable, nor does he provide any argument that would overcome the traditional deference afforded to counsel. Moreover, "[c]ounsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Therefore, to the extent Perez claims that counsel should have renewed prior objections that had already been ruled on, he fails to establish why doing so would not have been viewed as frivolous or futile.

In addition, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland, supra,* 466 U.S. at p. 697.) It is not enough to establish prejudice for defendant to propose that counsel's performance had some "conceivable effect" on the outcome. (*Id.* at p. 693.) Instead, prejudice must be a demonstrable reality established based on facts in the record, not simply speculation as to the effect of the errors or omissions of counsel. (*People v. Williams (*1988) 44 Cal.3d 883, 933; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1151.) As Perez provides no argument on how the alleged deficiencies resulted in prejudice to him, he has failed to meet his burden to establish ineffective assistance of counsel on either of the prongs required under *Strickland*.

## III.   DISPOSITION

The judgment is affirmed.

_____
                    Wilson, J.

WE CONCUR:


_____
          Grover, Acting P. J.


_____
          Lie, J.


*People v. Perez*
H051920